IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARMINE JOSHUWA GARGANO, | ) | CASE NO.  1:16-cv-00796 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Carmine Joshuwa Gargano ("Plaintiff" or "Gargano") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.   As explained more fully below, the ALJ's analysis of the medical opinion evidence is insufficient to allow the Court to assess whether the decision is supported by substantial evidence.  Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

## I.  Procedural History

Gargano protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on July 23, 2013.[1]  Tr. 22, 85-86, 177-180, 181-186. Gargano alleged a disability onset date of May 15, 2013.  Tr. 22, 177, 181, 202, 226.   He alleged

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 3/13/2017).

disability due to memory problems, bipolar disorder, cannabis dependence, schizoaffective disorder, and back problems. Tr. 64, 87, 117, 133, 202. Gargano's applications were denied initially (Tr. 117-130) and upon reconsideration by the state agency (Tr. 133-137). Thereafter, he requested an administrative hearing. Tr. 143-144. On April 28, 2015, Administrative Law Judge Eric Westley ("ALJ") conducted an administrative hearing. Tr. 36-63.

In his May 19, 2015, decision (Tr. 19-35), the ALJ determined that Gargano had not been under a disability within the meaning of the Social Security Act from May 15, 2013, through the date of the decision. Tr. 22, 30. Gargano requested review of the ALJ's decision by the Appeals Council. Tr. 14-18. On February 11, 2016, the Appeals Council denied Gargano's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A.  Personal, vocational and educational evidence

Gargano was born in 1983. Tr. 42, 177. He was 31 years old at the time of the administrative hearing. Tr. 42. Gargano lives alone in a house that he and his father own. Tr. 41. He is not married and has no children. Tr. 43. He completed school through the 12th grade and started working right after high school. Tr. 42-43. He worked at a coffee/donut shop owned by his father. Tr. 45-46. The shop sold other items such as tobacco and lottery. Tr. 45. Gargano stocked shelves and performed janitorial work. Tr. 45-46. Gargano had some minimal supervisory responsibilities. Tr. 45-46. For example, if someone did not show up for work, he would call them or try to find out why they were not at work. Tr. 46. Ultimately, his father fired him because he had made some female co-workers cry and was showing up late or not showing up for work. Tr. 46-47. Gargano was not told and he does not know what he did to make his co-workers cry. Tr. 47. Gargano worked for a painting company doing outdoor painting when

he was in high school. Tr. 47-48. Gargano's most recent work attempt was in the fall of 2014. Tr. 43. He worked at a zombie paintball attraction at Mapleside, an apple farm. Tr. 43-45. His friends were responsible for running the paintball attraction so his schedule was pretty much whatever he wanted it to be. Tr. 44. Gargano was not fired from the job; the job just ended. Tr. 45.

**B.    Medical evidence**

**1.    Treatment history**

On May 15, 2013, Gargano presented to the emergency room at Lutheran Hospital with complaints of hallucinations. Doc. Tr. 268-271. Gargano's mother was present with him. Tr. 238. Gargano's mother relayed that, over the prior two weeks, her son had been wandering around and acting strange. Tr. 268. Gargano considered jumping off a bridge, thinking it was part of a quarry with water. Tr. 268. Gargano admitted to abusing marijuana and opiates but denied using for about a week. Tr. 268. However, the lab results on admission were positive for marijuana. Tr. 249. Gargano had never been diagnosed with a mental health issue. Tr. 268. He denied any exacerbating or alleviating factors and denied any suicidal or homicidal ideations. Tr. 268. On physical examination, Gargano was observed to have a normal mood and affect; his thought content was normal; his speech was rapid and/or pressured and tangential; he was actively hallucinating; his thought content was not paranoid and not delusional; his cognition and memory were normal; he expressed impulsivity; and he expressed no homicidal or suicidal plans or ideation. Tr. 269. Gargano was initially diagnosed with hallucinations and schizophrenia. Tr. 270. His GAF score on admission was 39.[2] Tr. 252. He was admitted to North Coast Behavioral Center from May 17, 2013, through May 31, 2013. Tr. 248, 272.

---

[2] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric

During his admission at North Coast Behavioral Center, Gargano reported that he did not trust anyone except his mother; he had neglected his personal hygiene, he had periods of over activity and periods of sleeping just a few hours; he lost almost 50 pounds over several months; his spending behavior was reckless; he felt that people were out to get him; and he had very impulsive behavior.  Tr. 248.  Gargano had a history of skeletal pain that led to OxyContin abuse and he almost ended up in trouble for drug trafficking.  Tr. 248.  Gargano also had a past history of using steroids for bodybuilding.  Tr. 248.  When he used steroids, he had racing thoughts.  Tr. 248.  At discharge, Gargano's diagnoses were bipolar I, hypomanic with psychotic features and marijuana dependence.  Tr. 248.  His GAF score was 56 at discharge.[3]  Tr. 252.  At discharge, Gargano was in control; not psychotic; not suicidal; had no auditory or visual hallucinations; his mood was even; and his judgment and insight had improved.  Tr. 251.  Dr. Manual Gordillo, M.D., the discharging physician, recommended that Gargano return home, look for a job, and proceed with outpatient psychiatric follow up at Center for Families and Children Service.  Tr. 252.  Gargano's prognosis was guarded.  Tr. 252.

On July 18, 2013, Gargano began receiving outpatient services at Center for Families and Children Service.  Tr. 301-306.  Gargano saw Maureen Sweeney, NP, for a Psychiatric Evaluation.  Tr. 301-306.  Gargano reported that he was seeking treatment because he was not feeling mentally stable.  Tr. 301.  Gargano's mother was present for the evaluation. Tr. 301.

---

Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

[3] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.

Gargano and his mother indicated that his symptoms started when he was 16 or 17 years old.  Tr. 301.  Gargano reported psychomotor agitation (shaking legs) and sleep disturbance.  Tr. 301.  Gargano was sleeping 2 hours a night.  Tr. 301.  He reported daily audio hallucinations, visual hallucinations, manic periods lasting for weeks to months, and depressive periods that last for days.  Tr. 301.  Nurse Sweeney observed that Gargano appeared hypomanic during the evaluation.  Tr. 301.  Gargano reported using marijuana a couple times per week and drinking alcohol only occasionally.  Tr. 301.  Gargano felt that the marijuana helped with the pain in his body.  Tr. 301.  Gargano indicated that he had been working with his father but his father did not want him to work at the donut/coffee shop because of his mental illness.  Tr. 302.  Gargano indicated that he had a lot of debt from being in business with his father.  Tr. 302.  Nurse Sweeney diagnosed bipolar I disorder, with psychotic features but rule out schizoaffective disorder, noting that it was unclear whether Gargano's psychotic features go away when Gargano is not manic.  Tr. 303.   Nurse Sweeney assigned a GAF score of 40.  Tr. 304.  Gargano was taking Gedeon and Depakote ER but reported having more days of severe depression.  Tr. 303.  Nurse Sweeney modified Gargano's medications.  Tr. 303.  She added Seroquel XR, continued Depakote, and decreased the Gedeon dosage.  Tr. 303.

Gargano saw Nurse Sweeney again on August 1, 2013.  Tr. 308-309.  Gargano indicated that he was depressed and irritable.  Tr. 308.  He was feeling isolated because his father and sister were judgmental about him seeking mental health treatment.  Tr. 308.  Gargano was continuing to have audio hallucinations but only at night.  Tr. 308.  Nurse Sweeney observed that Gargano appeared euthymic during the appointment and discussed with Gargano that his feelings of depression could be the effect of returning to euthymia following a period of hypomania.  Tr. 308.  Gargano reported medication side effects of sedation and muscle tightness.  Tr. 309.  Nurse

Sweeney continued Gargano on Depakote, discontinued Gedeon, increased Seroquel, and added Cogentin to address Gargano's muscle tightness.  Tr. 309.   On August 13, 2013, Gargano saw Nurse Sweeney and reported "still feeling really depressed."  Tr. 310.  Gargano was sleeping about 10 hours each day and still feeling fatigued during the day.  Tr. 310.  Gargano was continuing to have audio hallucinations but only at night.  Tr. 310.  Nurse Sweeney ordered Wellbutrin to address Gargano's depression but advised that there was a risk that the new medication could cause mania.  Tr. 311.  Gargano expressed his understanding of the risks and felt that the possible benefits outweighed the risks.  Tr. 311.   Nurse Sweeney indicated she would see Gargano again in 2 weeks to start him on Wellbutrin.  Tr. 311.  On August 27, 2013, Gargano saw Nurse Sweeney and reported the he was "still feeling pretty down."  Tr. 312.  Nurse Sweeney started Gargano on Wellbutrin.  Tr. 313.

On September 23, 2013, Gargano saw Nurse Sweeney.  Tr. 315-316.  Gargano indicated that his mood was "normal."  Tr. 315.  During that month, Gargano had a decreased need for sleep and he was having paranoid delusions.  Tr. 315.  He felt "like there was a conspiracy to get [him]" and "thought that the government was watching [him] and that other people's animals were watching [him.]"  Tr. 315.   Since starting on Wellbutrin, Gargano indicated that he felt less depressed and did not think that the Wellbutrin was causing his manic symptoms.  Tr. 315.  He relayed that, prior to having the manic symptoms, he had an increase in stressors – he had received a number of shut off notices from the city.  Tr. 315.  Gargano reported that he was continuing to have audio hallucinations.  Tr. 315.  He explained that, "[he] zone[s] out and [doesn't] hear the t.v. and . . . hear[s] old friend's that are no longer with [him], in a good way[.]"  Tr. 315.  Nurse Sweeney noted that Gargano was not manic or hypomanic.  Tr. 315.  Also, she indicated that Gargano's mood had "gotten better" since starting on Wellbutrin.  Tr. 316.  Since

Gargano was having psychotic symptoms in the absence of mood deregulation, Nurse Sweeney suspected that a more accurate diagnosis might be schizoaffective disorder.  Tr. 315-316.   Nurse Sweeney increased Gargano's Seroquel to target his psychotic symptoms.  Tr. 316.

On October 7, 2013, Gargano saw his primary care physician Dr. Mudita Bhatia, M.D., for a physical at which time it was noted that Gargano was receiving outpatient treatment for bipolar disorder.  Tr. 294.  Gargano indicated that his hallucinations/delusions had improved since May 2013 but, at times, his mother observed him talking to himself or unseen people. Tr. 294.  Also, it was noted that Gargano had very low attention and concentration and did not do anything at home except read.  Tr. 294.

During an October 21, 2013, appointment with Nurse Sweeney, Gargano indicated that his mood was "okay."  Tr. 318.  He was continuing to have a difficult time processing stressors but was gaining insight.  Tr. 318.  He denied psychotic features.  Tr. 318.  Nurse Sweeney indicated that Gargano appeared stable on his medications.  Tr. 319.  On November 18, 2013, Gargano saw Nurse Sweeney.  Tr. 320.  He indicated that "things [were] okay, a little out of sorts[.]"  Tr. 320.  He indicated that he was "not feeling up or down."  Tr. 320.  Gargano had no major issues to report.  Tr. 320.  He reported that his sleep was good.  Tr. 320.  Gargano was somewhat withdrawn but did not seem uncomfortable with that.  Tr. 320.   Gargano denied psychotic symptoms and, when asked if he thought his medication was helpful, he indicated, "yes . . . I was really out in left field before the meds[.]"  Tr. 320.   Nurse Sweeney indicated that Gargano's mood was stable.  Tr. 320-321.

On January 2, 2014, Gargano saw Nurse Sweeney reporting, "I am not feeling too good today[.]"  Tr. 338.  Gargano reported anger and irritability.  Tr. 338.  Nurse Sweeney was not sure whether Gargano's irritability was related to his depression or to personality issues.  Tr. 339.

Since Gargano did not report other symptoms of depression, Nurse Sweeney suspected that Gargano's irritability was related to personality issues.  Tr. 339.  Nurse Sweeney explained that anger is not something that is medicated and she offered Gargano a referral for counseling but Gargano declined.  Tr. 338, 339.   Gargano denied any hypomanic, manic, or psychotic symptoms.  Tr. 338.  Nurse Sweeney indicated that Gargano was easily confused.  Tr. 338.

During a February 3, 2014, visit with Nurse Sweeney, Gargano relayed that he was "really hearing a lot of voices all the time[.]"  Tr. 340.  Gargano's mood was "down."  Tr. 340.  Gargano was hearing multiple voices and felt like certain television and radio programs were talking to him.  Tr. 340.  Gargano had insight into his feelings being abnormal but was continuing to have them.  Tr. 340.  Gargano's sleep was poor and varied.  Tr. 340.  At times, he was sleeping 10-12 hours a day and, at other times, he could not sleep.  Tr. 340.  Gargano reported no mania/hypomania symptoms.  Tr. 340.  Nurse Sweeney switched Gargano's diagnosis to paranoid schizophrenia due to the presence of psychotic features in the absence of mood issues.  Tr. 341.  Nurse Sweeney started Gargano on Latuda in place of Seroquel.  Tr. 341.  Gargano did not think that the Seroquel helped and it made him groggy.  Tr. 340.

On March 3, 2014, Gargano saw Nurse Sweeney and reported that "the [L]atuda works much better than the [S]eroquel[.]"  Tr. 342.  Gargano was no longer having audio hallucinations but he was having paranoid delusions.  Tr. 342.  He felt that the government was watching him through his electronic devices.  Tr. 342.   Nurse Sweeney observed that Gargano appeared less blunted and was pleasant.  Tr. 343.  Nurse Sweeney noted the possibility of sleep apnea.[4]  Tr. 342

---

[4] On March 14, 2014, a sleep study was performed.  Tr. 347-356.  The results of the sleep study showed mild obstructive sleep apnea that was controlled on CPAP therapy.  Tr. 349.

On April 1, 2014, Gargano saw Nurse Sweeney and reported that his mood had been "up and down" that month but better on Latuda.  Tr. 357.  Gargano's audio hallucinations and paranoid symptoms were reduced but he continued to believe he was being monitored through his television and computer but recognized that those thoughts were "not normal."  Tr. 357. Gargano was continuing to have difficulty processing information, especially when complicated situations were involved.  Tr. 357.  Nurse Sweeney observed a change in Gargano's physical appearance over the preceding year, noting that Gargano was dressing very casual and his hair was disheveled and no longer styled.  Tr. 357.  Nurse Sweeney continued to diagnose paranoid schizophrenia, noting that Gargano's psychotic symptoms had improved on Latuda but he was continuing to suffer negative symptoms of schizophrenia, including cognitive impairments evidenced by difficulty processing information.  Tr. 358.

On May 1, 2014, Gargano saw Nurse Sweeney reporting that he was "still having up and down days[.]"  Tr. 359.  Gargano felt that the Latuda was helping with his paranoid thoughts but he was continuing to have delusions about people monitoring him at his home.  Tr. 359. Gargano continued to understand that these were abnormal thoughts but they felt very real to him.  Tr. 359.  Gargano decreased his Depakote on his own because he was sleeping too much. Tr. 359.  There was no mania/hypomania present and Gargano's speech was normal.  Tr. 359. Gargano's sleep had improved on the CPAP.  Tr. 359.  Gargano was continuing to isolate himself, which he indicated was due to his mood.  Tr. 359.   Because Gargano was continuing to have psychotic features, Nurse Sweeney increased Gargano's Latuda.  Tr. 360.  Also, Nurse Sweeney increased Gargano's Wellbutrin for his mood.  Tr. 360.   During a May 31, 2014, visit with Nurse Sweeney, Gargano reported that "things are getting better[.]"  Tr. 361.  Gargano denied audio hallucinations or delusional thinking – he no longer felt that the television was

sending him messages. Tr. 361. Gargano was continuing to exhibit a flat affect, which his family was having a difficult time with. Tr. 361. Gargano's sleep was better; he was averaging about 8 hours. Tr. 361. Nurse Sweeney's assessment was that Gargano appeared more stable. Tr. 362. Nurse Sweeney informed Gargano that he would be seeing Kelley Kauffman because Nurse Sweeney was going to be out on leave. Tr. 362.

On June 30, 2014, Gargano saw Kelley Kauffman, RN, NP. Tr. 363-364. Gargano reported that he had been taking it easy and was compliant with his medication. Tr. 363. He indicated that his audio hallucinations had decreased but he was having visual hallucinations. Tr. 363. He was having "feelings that animals and bugs [were] tracking him and reporting back to someone unknown." Tr. 363. He said he ignores cameras and reported some paranoia of an unknown threat that he had been trying to discover for over a year. Tr. 363. Gargano stated that when he takes his Latuda he feels he needs to pace. Tr. 363. The Cogentin was not helping with Gargano's restlessness so Gargano requested an increase. Tr. 364. Nurse Kauffman increased Gargano's Cogentin dose and continued his other medication. Tr. 364.

On July 30, 2014, Gargano saw Nurse Sweeney. Tr. 365. Gargano reported that his mood was "good for the most part[.]" Tr. 365. He was continuing to experience akathisia[5] "mostly at night" due to the Latuda but he was not taking his Cogentin regularly. Tr. 365, 366. Nurse Sweeney discussed this with Gargano and he agreed to increase his medication compliance. Tr. 366. Gargano denied psychotic features. Tr. 365. He was continuing to have some tax issues related to his father's business. Tr. 365. Gargano was no longer taking Depakote but continued with Cogentin, Latuda and Wellbutrin. Tr. 366.

---

[5] Akathisia, spelled akesthesia in the treatment records, is "a condition of motor restlessness in which there is a feeling of muscular quivering, an urge to move about constantly, and an inability to sit still[.]" *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 42.

During an August 27, 2014, visit with Nurse Sweeney, Gargano indicated that his mood was "okay." Tr. 367.  He denied audio hallucinations but continued to have delusional thinking. Tr. 367.  He relayed, "I feel like when I see white cars then they are all on the same team or something." Tr. 367.  His sleep was okay except when his akathisia was bad. Tr. 367.  His Cogentin was not working. Tr. 367.  Nurse Sweeney recommended discontinuing Cogentin because it was not effective and starting Benadryl. Tr. 368.

On September 25, 2014, Gargano saw Nurse Sweeney reporting that his mood was "okay but stressed[.]" Tr. 369.  Gargano relayed that he was working at Mapleside Farm for the season. Tr. 369.  He was enjoying the work but was feeling stressed because he was working Monday through Friday 8:30-6 and unable to find time to meet with his case manager to discuss getting assistance with his medical bills. Tr. 369.  However, Gargano did indicate that his mom could drop off paperwork with his case manager and Nurse Sweeney encouraged Gargano to set up a phone appointment with his case manager. Tr. 369.  Sweeney indicated that his work was seasonal so he would stop working in November. Tr. 369.  Gargano indicated that the audio hallucinations were "less on meds" and he was using music as a distraction from baseline symptoms. Tr. 369.  Gargano's sleep was "good" – he was averaging 8 hours. Tr. 369.  He denied suicidal and homicidal ideation. Tr. 369.  Nurse Sweeney assessed Gargano as stable, noting he was able to work part time at a seasonal job and was compliant on medication. Tr. 370.  She noted he needed assistance with social stressors and would forward a note to his case manager regarding that need. Tr. 370.

On November 10, 2014, Gargano saw Nurse Sweeney and reported that his mood was "not great." Tr. 371.  Gargano indicated that performing seasonal work had affected his ability to take his medication so he was having more symptoms. Tr. 371.  He was taking Latuda

intermittently because of his work schedule.  Tr. 371.  He reported an increase in audio hallucinations and paranoia.  Tr. 371.  Gargano was interested in an injectable form of medication.  Tr. 371-372.   Nurse Sweeney discontinued Latuda and started Gargano on Invega with a plan to work towards Sustenna.  Tr. 372.

On December 1, 2014, Gargano saw Nurse Sweeney and reported that his mood was "okay" since starting on Invega but noted increased sedation and some mild toe cramping.  Tr. 373.  Gargano no longer believed that he had "vague 'special powers'" but he was having some paranoia.  Tr. 373.  He explained "he stares out his window and 'feels like there is something bad going to happen to him.'"  Tr. 373.  Gargano remained somewhat social with friends and he had recently had Thanksgiving dinner with his family.  Tr. 373.  Because of the sedation caused by the Invega, Gargano was interested in switching to a new medication.  Tr. 373.  Nurse Sweeney changed Gargano's medication from Invega to Abilify.  Tr. 374.

On February 2, 2015, Gargano saw Nurse Kauffman.  Tr. 376-377.  Gargano was euthymic with a congruent affect.  Tr. 376.  Gargano reported decreased paranoia and believed that his symptoms were well controlled on his current medication but he was still having instances of increased paranoia when under stress.  Tr. 376.  Gargano reported drinking to the point of "blacking out" when stressed.  Tr. 376.  Nurse Kauffman encouraged abstinence and discussed the effects of combining alcohol with medication.  Tr. 376.  Gargano saw Nurse Kauffman again on February 27, 2015.  Tr. 378-379.  Gargano reported that the Abilify was causing anxious feelings but did feel that the Abilify was helping manage his psychotic symptoms.  Tr. 378.  He denied internal restlessness but endorsed feeling that he needed to walk around.  Tr. 378.  He indicated that his mood was stable with intermittent paranoia that was manageable.  Tr. 378.   Gargano reported side effects of anxiety and heart burn.  Tr. 379.

Because side effects made taking his medication "regularly intolerable," Gargano requested a decrease in his medication rather than changing medications.  Tr. 378.   Gargano felt that the benefits of staying on Abilify at a reduced dose outweighed risks at the time.  Tr. 379.   Per Gargano's request, Nurse Kauffman decreased the Abilify dose to decrease the risk of side effects and continued the treatment of his symptoms of psychosis.  Tr. 379.

### 2.    Opinion evidence

#### a.  Treating sources

*Nurse Sweeney – January 2, 2014*

On January 2, 2014, Nurse Sweeney completed a "Mental Impairment Questionnaire (RFC & Listings)."  Tr. 324-327.  Nurse Sweeney indicated in the Questionnaire that she had seen Gargano since July 2013 and that Gargano had a diagnosis of bipolar I disorder and a GAF score of 40.  Tr. 324.  She offered the following information regarding his "treatment and response:"

> On Seroquel & Depakote for mood stabilization & Wellbutrin XL for depression. [N]o recent hypomanic/manic episodes but recent episodes of severe depression marked by anger/irritability.

Tr. 324.  Nurse Sweeney indicated that Gargano's medication caused drowsiness, fatigue, and lethargy.  Tr. 324.  Nurse Sweeney indicated that the following clinical findings demonstrated the severity of Gargano's impairment and symptoms – irritable during appointments; difficult time concentrating; often confused; needs repeated education on medication and mental health; very concrete in his thinking; and unable to cope with stressors.  Tr. 324.  Nurse Sweeney opined that Gargano was unable to function at a level needed to maintain employment because of his diagnosis of bipolar disorder that was expected to last for more than 12 months.  Tr. 324.

As part of the Questionnaire, Nurse Sweeney opined that Gargano had marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and three episodes of decompensation within a 12 month period, each of at least two weeks duration.  Tr. 327.

Nurse Sweeney also rated Gargano's functional abilities in specific categories within the areas of "understanding and memory limitations;" "sustained concentration and persistence limitations;" "social interaction limitations;" and "adaptation limitations."  Tr. 325-326.  The rating choices were "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet competitive standards," and "no useful ability to function."  Tr. 325.

In the area of "understanding and memory," Nurse Sweeney rated Gargano's ability to understand and remember very short and simple instructions as "unlimited or very good" and his ability to remember locations and work-like procedures and understand and remember detailed instructions as "seriously limited, but not precluded." Tr. 325.  She explained her ratings, noting that Gargano "has difficulty [with] concentration [and] memory when mood [at] extremes."  Tr. 325.

In the area of "sustained concentration and persistence," Nurse Sweeney rated Gargano's ability to carry out very short and simple instructions as "limited but satisfactory."  Tr. 325. Nurse Sweeney rated Gargano's ability in the following seven categories as "seriously limited, but not precluded" – carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decision; and perform at a consistent pace without an

14

unreasonable number and length of rest periods.  Tr. 325.  She rated Gargano as "unable to meet competitive standards" in the following two categories – manage regular attendance and be punctual within customary tolerances and complete a normal workday and workweek without interruptions from psychologically based symptoms.  Tr. 325.  She explained her ratings by noting that, "due to extreme moods related to bipolar [disorder,] [Gargano] is extremely limited in ability to handle normal work activities (i.e. concentration, persistence, attention, schedule)[.]"  Tr. 325.

In the area of "social interaction," Nurse Sweeney rated Gargano as "seriously limited, but not precluded" in his ability to ask simple questions or request assistance and "unable to meet competitive standards" in the following four categories - interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Tr. 326.  Nurse Sweeney explained her ratings, noting "[due to] bipolar [disorder] [Gargano] is extremely limited in ability to behave appropriately [with] co-workers or general public."  Tr. 326.

In the area of "adaptation," Nurse Sweeney rated Gargano as having "limited but satisfactory" ability to travel in unfamiliar places or use public transportation and she rated Gargano as "seriously limited, but not precluded" in his ability to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others.  Tr. 326.  She explained her ratings, noting "[Gargano] has difficulty processing information [due to] bipolar [disorder.]"  Tr. 326.

Nurse Sweeney indicated that Gargano did not have a low IQ or reduced intellectual functioning.  Tr. 326.  She opined that Gargano's impairments or treatment would cause him to be absent form work more than four days per month and his symptoms would cause him to be off-task 25% of an 8-hour workday.  Tr. 327.   Also, she opined that Gargano's symptoms would cause him to be tardy to work more than four times per month.  Tr. 327.

*Nurse Sweeney, co-signed by M.D. – March 3, 2014*

On March 3, 2014, Nurse Sweeney completed a Mental Status Questionnaire.  Tr. 334-336.  The March 3, 2014, Questionnaire was co-signed by an M.D.  Tr. 336.  However, the name of the M.D. is not identifiable from the signature.  Tr. 336.   Gargano's mental status was described as follows: his appearance was pale and somewhat disheveled; his flow of conversation and speech were normal rate, rhythm and volume; his mood was "good" and his affect was congruent on that date but in the past his affect was appropriate; he had anxiety about his normal life stressors; he had paranoid delusions that the government was watching him through technology, he felt like he was thought projecting and at times felt like the television and radio were talking to him and sending him messages so he was having delusions of reference; he was alert and oriented; he had difficulty with concentration and short term memory because at times he had difficulty telling reality from psychosis; he had impairment with abstract reasoning; he had good insight into psychotic features but only when symptoms are well controlled; his judgment was dependent on the level of psychosis; and there were no substance abuse issues.  Tr. 334.

Nurse Sweeney indicated that Gargano's diagnosis was paranoid schizophrenia.  Tr. 335.  Gargano's treatment included Latuda to decrease his psychosis but he was still having some

delusions of reference and paranoia.  Tr. 335.   Gargano was also taking Wellbutrin to stabilize his mood.  Tr. 335.

 Nurse Sweeney offered her opinion regarding Gargano's functional abilities.  Tr. 335. She opined that Gargano had difficulty with memory and comprehension due to psychosis.  Tr. 335.  He had severe difficulty in maintaining attention due to psychosis.  Tr. 335.  He had difficulty sustaining concentration or persisting at tasks due to psychosis.  Tr. 335.  He had difficulty interacting socially due to paranoia and psychosis and difficulty adapting due to psychosis.  Tr. 335.   In response to an inquiry regarding how Gargano would "react to the pressures, in work settings or elsewhere, involved in simple and routine, or repetitive, tasks," Nurse Sweeney stated that Gargano "would react very poorly to any work or life stressors as they would likely [increase] paranoia [and] psychosis."  Tr. 335.

### Nurse Kauffman and Dr. Hunt – April 2015

 In April 2015, Nurse Kauffman and Dr. Andrew Hunt, M.D., completed a "Mental Impairment Questionnaire."  Tr. 384-385.   Nurse Kauffman signed the Questionnaire on April 2, 2015, and Dr. Hunt signed the Questionnaire April 9, 2015.  Tr. 385.   They indicated that Gargano had been with the agency since July 2013 and with Nurse Kauffman in 2015.  Tr. 384. Gargano's diagnosis was listed as schizophrenia.  Tr. 384.  They indicated that Gargano was prescribed Abilify, Wellbutrin XL, and Cogentin, with restlessness listed as a side effect.  Tr. 384.   The following clinical findings were listed as demonstrating the severity of Gargano's impairment and symptoms – paranoia, disorganization, delusions of "special powers."  Tr. 384. Nurse Kauffman and Dr. Hunt indicated that Gargano's prognosis was "unclear, may be good with continued adherence to medication."  Tr. 384.   They opined that Gargano's impairment lasted or was expected to last at least 12 months.  Tr. 384.

Nurse Kauffman and Dr. Hunt also rated Gargano's functional abilities in specific categories within the areas of "sustained concentration and persistence limitations;" "understanding and memory limitations;" "social interaction limitations;" and "adaptation limitations."  Tr. 384-385.   The rating choices were "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet competitive standards," and "no useful ability to function."  Tr. 384.

In the area of "sustained concentration and persistence," Nurse Kauffman and Dr. Hunt rated Gargano's ability to carry out very short and simple instructions; to manage regular attendance and be punctual within customary tolerances; and perform at a consistent pace without an unreasonable number and length of rest periods as "seriously limited, but not precluded."  Tr. 384.   They rated Gargano as "unable to meet competitive standards" in the following categories – carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms.  Tr. 384.

In the area of "understanding and memory," Nurse Kauffman and Dr. Hunt rated Gargano's ability to understand and remember very short and simple instructions as "seriously limited, but not precluded" and "unable to meet competitive standards" in the following categories – remember locations and work-like procedures and understand and remember detailed instructions.  Tr. 385.

In the area of "social interaction," Nurse Kauffman and Dr. Hunt rated Gargano's ability to maintain socially appropriate behavior and adhere to basic standards of neatness and

cleanliness as "limited but satisfactory."  Tr. 385.  They rated Gargano as "seriously limited, but not precluded" in his ability to interact appropriately with the general public; ask simple questions or request assistance; and  accept instructions and respond appropriately to criticism from supervisors.  Tr. 385.   They indicated that Gargano was "unable to meet competitive standards" in the following category – get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 385.

In the area of "adaptation," Nurse Kauffman and Dr. Hunt rated Gargano as "seriously limited, but not precluded" in his ability to be aware of normal hazards and take appropriate precautions.  Tr. 385.   They rated Gargano as "unable to meet competitive standards" in the following categories – respond appropriately to changes in the work setting and set realistic goals or make plans independently of others.  Tr. 385.

Nurse Kauffman and Dr. Hunt opined that, on average, Gargano's impairments or treatment would cause him to be absent from work more than four days per month.  Tr.  385. Also, they opined that, on average, Gargano's symptoms would cause him to be off-task more than 25% of an 8-hour workday.  Tr. 385.

### b.  Consultative examiner

On October 8, 2013, Amber L. Hill, Ph.D., met with Gargano for the purpose of conducting a psychological evaluation.[6] Tr. 275-286.  When asked why he applied for social security disability benefits, Gargano responded, "Because of the mental state that I'm in.  I can't keep my train of thought."  Tr. 275.  Dr. Hill's diagnoses included bipolar disorder, most recent episode depressed, severe with psychotic features; opioid dependence with physiological dependence, in reported full sustained remission; alcohol dependence with physiological dependence; and cannabis dependence with physiological dependence.  Tr. 282-283.  Dr. Hill

---

[6] Per Gargano's request, Gargano's mother was present during the evaluation.  Tr. 275.

assigned a GAF score of 50.  Tr. 283.  Dr. Hill felt that Gargano's prognosis was guarded at the time because he was "engaged in pharmacological management related to his reported mental health concerns."  Tr. 283.  She indicated that "he could benefit from additional services such as counseling and therapy services" and noted that he was not participating in any type of drug or alcohol treatment pertaining to his reported remission from opioid dependence and abuse of alcohol and marijuana.  Tr. 283.

Dr. Hill opined that Gargano's reported symptoms of a current major depressive episode and at least one previous manic episode satisfied criteria for bipolar I disorder, most recent episode depressed, severe with psychotic features, including reports of auditory and visual hallucinations and paranoid ideation.  Tr. 283.  With respect to Gargano's work-related mental abilities, Dr. Hill opined:

1. Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.

   The claimant appears able to understand, remember, and carry out instructions as evidenced by his presentation during the clinical interview, his performance on the mental status exam tasks, and his report of daily functioning.  However, if the claimant is not taking his medication as prescribed or is experiencing a manic episode the claimant would likely be extremely limited in his ability to understand, remember, and carry out instructions related to his psychotic features.

2. Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.

   The claimant appears able to maintain attention and concentration, maintain persistence and pace, and perform simple and multi-step tasks as evidenced by his presentation during the clinical interview, his reported work and academic history, and his reported daily functioning.  However, the claimant is likely limited in his ability in all of these areas as he is not taking his medication as prescribed or is experiencing psychotic features with a manic episode.

3. Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.

The claimant is likely able to respond appropriately to supervisors and to coworkers within a work setting based on his socially appropriate manner of interacting within the clinical interview setting.  However, it is important to note that if the claimant is actively experiencing a manic episode, including psychotic features, the claimant is likely not able to respond appropriately to supervisors and to coworkers within a work setting related to his auditory and visual hallucinations and other psychotic features.  He would further be limited within a manic episode and is likely unable to respond appropriately if ever returning to his work setting that he has worked within for the past 12 years with his father related to his unresolved conflict and anger with his father.  The claimant could possibly benefit from counseling and therapy in this area to assist with improving limitations.  The claimant also reports an extensive history related to legal involvement.

4.  Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.

The claimant is likely limited in his ability to respond appropriately to work pressures within a work setting based on his report of paranoid ideation and other psychotic features that appear to be currently medication controlled. The claimant could possibly benefit from additional metal health services such as counseling and therapy to increase coping skills and address limitations in this area.  Further, the claimant has an extensive alcohol and drug history of which he is only reporting remission from his opioids and continues to use alcohol and marijuana, which could further exacerbate limitations in this area.

Tr. 285-286.

### c.  State agency reviewers

*Mel Zwissler, Ph.D.*

On October 10, 2013, state agency reviewing psychologist Mel Zwissler, Ph.D.,

completed a Psychiatric Review Technique and Mental RFC Assessment.  Tr. 68-71.[7]  As part of

the Psychiatric Review Technique, Dr. Zwissler opined that Gargano had moderate restrictions in

activities of daily living, moderate difficulties in maintaining social functioning, moderate

difficulties in maintaining concentration, persistence or pace, and one or two episodes of

decompensation, each of extended duration.  Tr. 69.

---

[7] Dr. Zwissler's opinions are also found at Tr. 78-81.

In assessing Gargano's Mental RFC, Dr. Zwissler found that Gargano had no understanding and memory limitations and no social interaction limitations.  Tr. 70-71.  Dr. Zwissler concluded that Gargano had limitations in sustained concentration and persistence and adaptation.  Tr. 70-71.

With respect to limitations in the area of sustained concentration and persistence, Dr. Zwissler opined that Gargano was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 70-71.  Dr. Zwissler found that Gargano was not significantly limited in his ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions.  Tr. 70-71.  Dr. Zwissler further explained in narrative form that Gargano could "carry out simple routine tasks without strict time demands."  Tr. 71.

With respect to adaptation limitations, Dr. Zwissler opined that Gargano was moderately limited in his ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others and not significantly limited in his ability to be aware of normal hazards and take appropriate precautions and travel in unfamiliar places or use public transportation.  Tr. 71.  Dr. Zwissler further explained in narrative form that Gargano could "adapt to minor expected and infrequent changes.  He could use help setting more realistic goals to be more independent and less reliant on [his] [m]other and girlfriend."  Tr. 71.

*Leslie Rudy Ph.D.*

Upon reconsideration, on December 13, 2013, state agency reviewing psychologist Leslie Rudy, Ph.D., completed a Psychiatric Review Technique and Mental RFC Assessment.  Tr. 92-93, 94-97.[8]  As part of the Psychiatric Review Technique, like Dr. Zwissler, Dr. Rudy opined that Gargano had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration.  Tr. 93.

In assessing Gargano's Mental RFC, Dr. Rudy found that Gargano had understanding and memory limitations, sustained concentration and persistence limitations, social interaction limitations, and adaptation limitations.  Tr. 95-96.

With respect to limitations in the area of understanding and memory, Dr. Rudy opined that Gargano was moderately limited in his ability to understand and remember detailed instructions and not significantly limited in his ability to understand and remember very short and simple instructions.  Tr. 95.  Dr. Rudy found no evidence of limitation in ability to remember locations and work-like procedures.  Tr. 95.  Dr. Rudy further explained in narrative form that Gargano "reports being able to follow short/simple instructions, must be reminded to care for pet.  He does live alone.  Can do one and two step tasks."  Tr. 95.

With respect to limitations in the area of sustained concentration and persistence, Dr. Rudy opined that Gargano was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

---

[8] Dr. Rudy's opinions are also located at Tr. 105-110.

consistent pace without an unreasonable number and length of rest periods.  Tr. 95-96.  Dr. Rudy found that Gargano was not significantly limited in his ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions.  Tr. 95-96.  Dr. Rudy further explained in narrative form that Gargano could "carry out simple routine tasks without strict time demands.  He reports that he can watch [television] but doesn't pay attention.  He has [a history of] mood swings and excessive sleep."  Tr. 96.

With respect to social interaction limitations, Dr. Rudy opined that Gargano was markedly limited in his ability to interact appropriately with the general public; moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and not significantly limited in his ability to ask simple questions or request assistance.  Tr. 96.  Dr. Rudy further explained in narrative form Gargano "neglects ADLs and has mood swings to mania.  He has also reported some paranoid delusions.  He can do work that doesn't involve contact with the general public and only superficial contact with coworkers and supervisors."  Tr. 96.

With respect to adaptation limitations, Dr. Rudy opined that Gargano was moderately limited in his ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others.  Tr. 96.  Dr. Rudy also opined that Gargano was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions and travel in unfamiliar places or use public transportation.  Tr. 96.  Dr. Rudy further explained

in narrative form that Gargano "can adapt to minor expected and infrequent changes.  He could use help setting more realistic goals to be more independent and less reliant on [his] [m]other and girlfriend.  [Gargano] has been [diagnosed] with DAA but cut down per report."  Tr. 96.

## C.      Testimonial evidence

### 1.      Plaintiff's testimony

Gargano was represented and testified at the hearing.  Tr. 41-57, 59.   Gargano resides in his own home but he has his mail sent to his mother's house to make sure he does not lose anything important.  Tr. 41-42.

Gargano explained that he would be unable to work a regular 40 hour per week job because he cannot keep a set schedule due to his irregular sleep patterns.  Tr. 48.  Gargano indicated that his medication affects his sleep.  Tr. 49, 52-53.  At times, Gargano is unable to sleep at all due to his schizophrenia causing him to be manic for days.  Tr. 53.  At other times, Gargano sleeps all the time and cannot get out of bed.  Tr. 53.  Gargano also indicated that he would have issues getting along with people at a job because he does not have the ability to always listen and isolates himself at times.  Tr. 49-50.  Gargano has paranoia about people watching or listening to him and/or thinks that people know what he is thinking. Tr. 49-50, 53-54.

When Gargano is depressed he estimated being in bed about 12 hours a day, on the couch about 6 hours a day and in a chair about 2 hours a day.  Tr. 54-55.  He does not use the phone or television and does not have people over.  Tr. 54.  Sometimes he can read a book or comics or play an instrument but sometimes he cannot do those things.  Tr. 54-55.  He tries to keep himself occupied because he feels crazy – like pulling all his hair out or jumping off bridges or jumping into rivers.  Tr. 55.  When Gargano is in a manic state, he feels unstoppable.  Tr. 55-56.  Gargano

does not know what triggers a manic state.  Tr. 56.  Gargano could not say whether his manic behavior was tied to a medication change.  Tr. 56.  He stated that he follows his doctors' orders regarding treatment and has always been honest with the effects and side effects of medication. Tr. 57.

Gargano had past problems with abusing pain pills but he went to rehab, NA and AA.  Tr. 50-51.  He still uses marijuana every so often.  Tr. 51.  Gargano uses marijuana to help him sleep and to help increase his appetite.  Tr. 51-52.  He does not have an appetite and does not prepare meals for himself.  Tr. 52.  At the hearing he was at a good weight of 200 pounds but in the past he has been down to 140 pounds.  Tr. 52.

### 2. Vocational Expert

Vocational Expert ("VE") Deborah Lee testified at the hearing.  Tr. 57-61.  The VE described Gargano's past work at the coffee shop as stock clerk, a heavy, SVP 4 job, and cashier II, a light, unskilled, SVP 2 job.[9]  Tr. 58-59.  The ALJ asked the VE to assume a hypothetical individual who can work at all exertional levels; perform simple tasks in a setting with no more than infrequent changes; perform goal oriented work but cannot work at a production rate pace; and interact with supervisors and co-workers if that interaction is limited to speaking and signaling but cannot interact with the public.  Tr. 59-60.  The VE indicated that the described individual would be unable to perform Gargano's past work but there were other jobs that could be performed, including (1) kitchen helper, a medium, unskilled position; (2) hand packager, a medium, unskilled position; and (3) laundry worker II, a medium, unskilled position.[10]  Tr. 60.

---

[9] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

[10] The VE provided regional, state and national job incidence data for the jobs identified.  Tr. 60.

Next, the ALJ asked the VE to consider a hypothetical individual who would be off task 20% of the time. Tr. 60. The VE indicated that 20% would be excessive and could lead to an inability to maintain employment. Tr. 60-61. In response to additional questioning from the ALJ, the VE indicated that being absent from work two days per month on an ongoing basis would also be considered excessive. Tr. 61.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

period of at least twelve months, and his impairment meets or equals a listed impairment,[12] claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[13] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his May 19, 2015, decision, the ALJ made the following findings:[14]

1.     Gargano meets the insured status requirements through December 31, 2015. Tr. 24.

2.     Gargano has engaged in substantial gainful activity since May 15, 2013, the alleged onset date. Tr. 24. In particular, Gargano engaged in substantial gainful activity from September 1, 2014, through November 2014. Tr. 24.

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[13] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[14] The ALJ's findings are summarized.

3.      Gargano has the following severe impairment: schizoaffective disorder.
        Tr. 24-25.

4.      Gargano does not have an impairment or combination of impairments
        that meets or medically equals the severity of on the Listings.  Tr. 25-26.

5.      Gargano has the RFC to perform a full range of work at all exertional
        levels but with the following nonexertional limitations: Can perform
        simple tasks in a setting with no more than infrequent changes; can
        perform goal-oriented work but cannot work at a production rate pace;
        can interact with supervisors or coworkers if that interaction is limited to
        speaking and signaling; cannot interact with the public.  Tr. 26-29.

6.      Gargano is unable to perform any past relevant work.  Tr. 29.

7.      Gargano was born in 1983 and was 30 years old, which is defined as a
        younger individual age 18-49, on the alleged disability onset date.  Tr. 29.

8.      Gargano has at least a high school education and is able to communicate
        in English.  Tr. 29.

9.      Transferability of job skills is not material to the determination of
        disability.  Tr. 29.

10.     Considering Gargano's age, education, work experience and RFC, there
        are jobs that exist in significant numbers in the national economy that
        Gargano can perform, including kitchen helper, hand packager, and
        laundry worker II.  Tr. 29-30.

Based on the foregoing, the ALJ determined that Gargano had not been under a disability,

as defined in the Social Security Act, from May 15, 2013, through the date of the decision.  Tr.

30.

## V. Parties' Arguments

Gargano contends that reversal and remand is warranted because the ALJ did not comply

with the regulations when weighing the medical opinion evidence offered by his treating nurses

and psychiatrist, and the consultative examining psychologist.  Doc. 16, pp. 11-19, Doc. 20.

The Commissioner argues that the ALJ explained why controlling weight was not

assigned to the treating source opinions and those reasons are sufficient to comply with the

regulations and satisfy the treating physician rule.  Doc. 19, pp. 10-13.  Also, the Commissioner

argues that the consultative examining psychologist's opinion supports the ALJ's RFC and,

therefore, the failure to assign weight to the opinion is not a basis for reversal.  Doc. 19, pp. 13-

19.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v.

Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

As discussed more fully below, the ALJ assigned no weight to the medical opinion evidence of record resulting in the inability of this Court to conduct a meaningful review of the decision to assess whether it is supported by substantial evidence.

**B.     Reversal and remand is warranted for  further articulation regarding the weight assigned to the treating source medical opinion evidence**

Gargano challenges the ALJ's weighing of the opinions of his treating psychiatrist and treating nurses.  In challenging the ALJ's decision in this regard, Gargano acknowledges that the nurses are not "acceptable medical sources" under the regulations and that the ALJ explained that he was not providing controlling weight to the treating source opinions.  However, Gargano argues that reversal and remand is warranted because the ALJ failed to explain what, if any, weight was assigned to any of the treating source opinions and, therefore, the ALJ did not comply with the regulations regarding weighing of medical opinion evidence, including SSR 06-03p and the "good reasons" rule.

The Commissioner contends that the ALJ properly weighed the treating source opinion evidence, arguing that, although the ALJ did not specify the weight assigned, the ALJ provided reasons for not giving controlling weight to the treating source opinions and those reasons were also "good reasons" for providing little or no weight to the treating source opinions.  Doc. 19, pp. 10-13.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

31

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for the weight given to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).   In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).   However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'"  *Id.*  at 937-938 (citing *Wilson*, 378 F.3d at 544).  Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'"  *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

Not all medical sources are "acceptable medical sources."  *See* 20 C.F.R. § 404.1513. For example, nurse practitioners are medical sources but they are not considered "acceptable medical sources."  *Id.*  However, the opinion of a medical source who is not an "acceptable medical source" who has seen a claimant in her professional capacity is relevant evidence.  SSR 06-03p, 2006 WL 2329939, * 6 (August 9, 2006).  SSR 06-03p provides guidance as to how opinions of medical sources who are not "acceptable medical sources" are to be considered, stating,

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' [and] [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.

The ALJ discussed the opinions rendered by Nurse Sweeney, Nurse Kauffman, and Dr. Hunt, stating:

> The record contains treating source statements from Ms. Sweeney (Exs. 6F and 8F).  She reports that the claimant has marked and extreme limitations in the "B" criteria discussed above.  However, she is not an acceptable medical source (SSR 06-03p).

> At Exhibit 12F, dated, April 9, 2015, Andrew Hunt, MD, an acceptable medical source, and Kelly Kauffmann, a non-acceptable medical source, report that the claimant is unable to meet the competitive requirements of routine work in several domains.

> However, the undersigned finds that these opinions are inconsistent with the other substantial evidence of record and are, therefore, not entitled to controlling weight (SSR 96-2p).

For example, as indicated, his treatment notes indicate his Abilify medication is managing any psychotic symptoms "well", that the claimant's mood is stable, and that he has intermittent paranoia, but this is manageable, per the claimant (Ex. 11F page 6).

He is able to live alone and perform his activities of daily living.  He was able to get hired for seasonal work in September 2014.

Tr. 27.

Gargano acknowledges that Nurse Sweeney and Nurse Kauffman are not "acceptable medical sources" and that the ALJ stated reasons why controlling weight was not provided to the treating source opinions but contends that the ALJ's consideration and analysis of treating source opinions falls short of satisfying the requirements of the treating physician rule and regulations regarding weighing of medical opinion evidence from treating sources.  The Court agrees.

Here, the ALJ's analysis is not sufficiently specific to allow this Court the ability to determine whether the decision is supported by substantial evidence.

The ALJ did not indicate what amount of weight, if any, was assigned to the treating source opinions.  Thus, the Court is left to speculate.  If the ALJ assigned no weight to all the treating source opinions, including that of the treating psychiatrist, who is an "acceptable medical source," the ALJ should have provided reasons for assigning no weight so that the Court could assess whether those reasons were "good reasons" and supported by substantial evidence.

Also, even though Nurse Sweeney is not an "acceptable medical source," she was Gargano's primary psychiatric treatment provider who provided treatment on a regular basis yet the ALJ provided no real analysis of her detailed opinions or treatment notes.

To the extent that the Commissioner points to the ALJ's reference to Gargano's seasonal employment as a "good reason" to provide no weight to the treating source opinions, as reflected in the hearing testimony, Gargano's friends hired him and he had flexibility over his own

34

schedule.  Tr. 43-45.  Also, during a November 10, 2014, appointment with Nurse Sweeney, Gargano reported that his mood was "not great," indicating that he had been performing seasonal work and it was affecting his ability to take his medication so he was having more symptoms, e.g., increased audio hallucinations and paranoia.  Tr. 371.

In light of the foregoing, without a more thorough discussion by the ALJ regarding the weight actually assigned to the treating source opinions and/or the reasons for providing no weight to the opinions, the Court is unable to assess whether the ALJ's decision is supported by substantial evidence.  Accordingly, reversal and remand is warranted for further articulation regarding the ALJ's consideration of and the weight assigned to the treating source opinions.

**C.**   **Reversal and remand is warranted for further articulation regarding the weight assigned to non-treating source medical opinions**

Gargano also challenges the ALJ's decision because the ALJ did not assign weight to the opinion of consultative examining psychologist Dr. Hill.

As set forth in the regulations, unless a treating source's opinion is assigned controlling weight, and ALJ is to consider the factors set forth in 20 C.F.R. § 404.1527(c) in deciding the weight assigned to any medical opinion.  20 C.F.R. § 404.1527(c).  Here, again, the ALJ's analysis falls short of satisfying the regulatory requirements for considering and weighing medical opinion evidence.

The ALJ acknowledged and recited Dr. Hill's opinion regarding Gargano's functional work-related limitations.  Tr. 28-29.  Immediately preceding that recitation, the ALJ discussed and clearly assigned little weight to a report from Gargano's mother.  Tr. 28.  Thus, while the ALJ assigned specific weight to the statement from a lay person, the ALJ did not assign weight or clearly explain his consideration of Dr. Hill's opinion.  Tr. 28-29.  Instead, the ALJ's conclusory statements that follow his discussion of Dr. Hill's opinion further complicates this

Court's review and assessment of whether the ALJ's decision is supported by substantial evidence.  In particular, following his recitation of Dr. Hill's opinion the ALJ stated:

> Based upon these opinions and the record, the state agency psychologist placed limitations upon the complexity of tasks the claimant could perform and upon the interaction with others (Ex. 6A).  The undersigned has incorporated these limitations into the determined residual functional capacity (SSR 96-6p).

Tr. 29. (emphasis supplied). Exhibit 6A contains the December 13, 2013, opinion of state agency reviewing psychologist Dr. Rudy.  Tr. 105-110.   However, it is not clear which opinions are "these opinions" that the ALJ is referring to.  It is not clear how much weight the ALJ assigned to Dr. Hill's opinion or to the state agency reviewing psychologist's opinion.  Also, it is not clear which limitations the ALJ was referring to when he stated "these limitations" have been incorporated into the RFC.   Was the ALJ referring to the state agency reviewing psychologist's limitations, Dr. Hill's limitations, or some combination?  Also, Dr. Hill's opinions regarding Gargano's work-related limitations were dependent upon his compliance with medication and/or whether he was experiencing a manic episode.  However, the ALJ does not make clear how these different opinions were considered and the reasons why the more limiting opinions were apparently rejected.

Although Dr. Hill and Dr. Rudy are not treating physicians entitled to deference under the treating physician rule, without a more thorough and clear articulation of the weight assigned to their opinions, including an explanation as to which opinions were accepted and which were  not and the reasons why, the Court is left to speculate as to what evidence the ALJ relied upon to support his RFC assessment and, therefore, is unable to determine whether the decision is supported by substantial evidence.

**VII. Conclusion**

For the reasons set forth herein, the Court **REVERSES and REMANDS** the

Commissioner's decision for further proceedings consistent with this opinion.

Dated: March 13, 2017

_____
Kathleen B. Burke
United States Magistrate Judge